IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BRIDGE AINA LE'A, LLC,

       Plaintiff,

       vs.

STATE OF HAWAII LAND USE
COMMISSION; VLADIMIR P.
DEVENS, in his individual and
official capacity; KYLE
CHOCK, in his individual and
official capacity; THOMAS
CONTRADES, in his individual
and official capacity; LISA
M. JUDGE, in her individual
and official capacity;
NORMAND R. LEZY, in his
individual and official
capacity; NICHOLAS W. TEVES,
JR., in his individual and
official capacity; RONALD I.
HELLER, in his individual and
official capacity; DUANE
KANUHA, in his official
capacity; CHARLES JENCKS, in
his official capacity; JOHN
DOES 1-10; JANE DOES 1-10;
DOE PARTNERSHIPS 1-10; DOE
CORPORATIONS 1-10; DOE
ENTITIES 2-10; and DOE
GOVERNMENTAL UNITS 1-10,

       Defendants.

_____

Civ. No. 11-00414 SOM-KJM


ORDER DENYING STATE OF
HAWAII'S RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, FOR A
NEW TRIAL


**ORDER DENYING STATE OF HAWAII'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

## I.      INTRODUCTION.

Defendant State of Hawaii Land Use Commission (the "State" or "Land Use Commission") has renewed its request for judgment as a matter of law, alternatively requesting a new trial.  For the reasons that follow, the court denies these requests.

## II.     BACKGROUND.

The factual background of this case has been discussed in the court's previous orders and is incorporated by reference. *See, e.g.*, ECF No. 131; ECF No. 283; ECF No. 318.

On March 19, 2018, at the close of Bridge Aina Leʻa's case-in-chief, the State moved for judgment as a matter of law. ECF No. 361.  On March 20, 2018, the court orally granted the motion in part, agreeing to limit any recovery by Bridge Aina Leʻa to nominal damages given court rulings excluding proffered evidence on just compensation.  *See* ECF No. 365.  The court denied the motion in all other respects.  *See id.*  Ultimately, the jury found that the State had taken Bridge Aina Leʻa's property without just compensation under both *Lucas* and *Penn Central* analyses.  *See* ECF No. 373.  The court entered judgment awarding nominal damages to Bridge Aina Leʻa on March 30, 2018. ECF No. 377.

On April 20, 2018, the State filed a Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a

New Trial ("Renewed Motion").  ECF No. 385.  The State claims it is entitled to judgment as a matter of law on four grounds: (1) the Land Use Commission's reversion order did not affect Bridge Aina Le'a's limited property interests; (2) there cannot be a taking stemming from an erroneous finding of fact by an agency in a quasi-judicial proceeding; (3) the evidence does not establish a *Lucas* taking as a matter of law; and (4) the evidence does not establish a *Penn Central* taking as a matter of law.  *See id.* at PageID #s 9293-9313.  In the alternative, the State requests a new trial on two grounds: (1) the court's jury instruction concerning the appropriate denominator was erroneous; and (2) the verdict is against the great weight of the evidence.  *See id.* at PageID #s 9213-16.  Bridge Aina Le'a filed a Memorandum in Opposition on May 18, 2018, ECF No. 401, and the State filed a Reply on June 1, 2018, ECF No. 403.

III.    **LEGAL STANDARD.**

   A.   **Rule 50(b) (Renewed Motion for Judgment as a Matter of Law).**

      If a portion of party's motion for judgment as a matter of law is not granted by the court, then, "[n]o later than 28 days after the entry of judgment, . . . the movant may file a renewed motion for judgment as a matter of law."  Fed. R. Civ. P. 50(b).  "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in

3

the pre-deliberation [] motion." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

The standard for granting judgment as a matter of law under Rule 50 "mirrors" the standard for granting summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). "A district court can grant a Rule 50[] motion for judgment as a matter of law only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003)). The moving party must show that the evidence, construed in the light most favorable to the nonmoving party, permitted only one reasonable conclusion, and that conclusion is contrary to jury's verdict. *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *Enovsys LLC v. AT&T Mobility LLC*, No. CV 11-5210 SS, 2015 WL 11089498, at *4 n.5 (C.D. Cal. Nov. 16, 2015) (explaining that "the moving party bears th[is] burden" even when the non-movant "had the burden [of proof] at trial" (citing *Anderson*, 477 U.S. at 250)).

The court may not assess the credibility of witnesses and must draw all reasonable inferences in the nonmovant's favor. *See Krechman*, 723 F.3d at 1110. The court's "job at

4

this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict." *Berry v. Hawaii Exp. Serv., Inc*., No. 03-00385 SOM/LEK, 2006 WL 1519996, at *2 (D. Haw. May 24, 2006) (quoting *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004)).

### B.   Rule 59(a) (Motion for a New Trial).

Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Precedential grounds for a new trial include a verdict that "is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or [implicates] a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). In ruling on a motion for a new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.

1987) (quoting *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880

F.2d 176, 190 (9th Cir. 1989)).  A new trial can be granted due

to an erroneous evidentiary ruling only if the ruling

"substantially prejudiced" the complaining party.  *Ruvalcaba v.*

*City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

**IV.      ANALYSIS.**

> **A.     The State Is Not Entitled to Judgment as a Matter**
> **of Law.**

The State is not entitled to judgment as a matter of

law on any of the grounds put forward in its Renewed Motion.

> > **1.     The State Has Not Identified Evidence**
> > **Indicating that Bridge Aina Le'a Possessed**
> > **Only a Token Property Interest Unaffected by**
> > **the Reversion.**

The Ninth Circuit uses "a two-step analysis to

determine whether a 'taking' has occurred: first, we determine

whether the subject matter is 'property' within the meaning of

the Fifth Amendment and, second, we establish whether there has

been a taking of that property, for which compensation is due."

*Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1002 (9th Cir.

2007).  This analysis begins with the factual question of what

property rights, if any, a plaintiff owns.  *See Philips v.*

*Marion Cty. Sheriff's Office*, 494 Fed. App'x 797, 799 (9th Cir.

2012).  On this antecedent issue, the court instructed the jury

as follows:

> > The first step in deciding whether Bridge
> > Aina Le'a's property has been taken is to

6

determine what property rights Bridge Aina
Leʻa owns.

Think of property rights as a bundle of
sticks.  One stick represents, for example,
the right to possess land.  One stick
represents the right to use the land.  One
stick represents the right to sell one's
interest in the land.  One stick represents
the right to develop the land, and so on.  A
person may possess one stick, but not the
whole bundle.  Your job is to determine what
sticks Bridge Aina Leʻa owns.

I instruct you that Bridge Aina Leʻa owns
the right of title to the land in issue.
You may consider whether Bridge Aina Leʻa
owns any other rights.

Once you have determined what rights Bridge
Aina Leʻa owns, you must consider whether
those rights have been taken.  In making
your determination, you must consider only
Bridge Aina Leʻa's interests in the
property.  You may not base your decision on
a determination that the Land Use
Commission's action affected a third party's
property interests, except insofar as the
impact on the third party's interests also
materially affected Bridge Aina Leʻa's
interests in the property.

ECF No. 372, PageID #s 7453-54.  This instruction was given with

the agreement of the parties.

According to the State, the evidence presented at

trial is susceptible to only one reasonable conclusion: that

Bridge Aina Leʻa's property interests were so "limited" that

they could "not [have been] affected by the reversion" of the

1,060-acre property from urban use to agricultural use.  ECF No.

385-1, PageID # 9293.  In making this argument, the State notes

7

that Bridge Aina Le'a "sold the 1,060 acres and its development rights to [separate] entities owned by Robert Wessel[s] prior to the reversion of the property in 2011." *Id.* at PageID # 9294 (citation omitted). If Bridge Aina Le'a had indeed completely "sold the property," the Land Use Commission's reversion order presumably could not have affected Bridge Aina Le'a's property interests. *Id. But see* ECF No. 401, PageID #s 9602-03 (arguing otherwise).

The jury was not persuaded. After deliberating, the jury found that Bridge Aina Le'a's property interests were taken and, in so doing, necessarily determined that Bridge Aina Le'a retained more than a token interest in the 1,060-acre property at the time of the reversion. *See* ECF No. 373. The jury's determination is supported by adequate evidence.

The State's position that Bridge Aina Le'a "sold the property" is, absent qualification, factually unsupported. Nothing in the record indicates that the property was completely sold. In fact, the State *concedes* that Bridge Aina Le'a owned the "right of title to the land in issue" at all relevant times. *See* ECF No. 385-1, PageID # 9294 (citation omitted). That concession directly contradicts the State's position that Bridge Aina Le'a's sale of the property left it with nothing that could have been affected by the reversion. *See id.*

The State's real claim seems to be that Bridge Aina Leʻa sold *some* of its property interests, and the remaining interests were not adversely affected by the Land Use Commission's reversion order. The State refers to testimony indicating that DW Aina Leʻa, a separate entity, executed a purchase and sale agreement under which it "gained possession of the property and had all development rights prior to the reversion." *Id.* Even taking the State's characterizations of the record at face value, they support, at most, the conclusion that Bridge Aina Leʻa sold two sticks out of its ownership bundle: the right to develop the property and the right to exclude DW Aina Leʻa. Even assuming that this conclusion is correct, the jury could have reasonably concluded that Bridge Aina Leʻa retained other property rights, including title to the land; the right to exclude entities other than DW Aina Leʻa; and the right to sell these residual interests. The jury, moreover, could have reasonably inferred that the reversion order diminished the value of Bridge Aina Leʻa's residual interests. For example, if otherwise barren property cannot be developed, it is not a stretch to think that the right to exclude someone from the land is close to worthless.

The State has failed to demonstrate an entitlement to judgment as a matter of law based on the idea that the State had no property interest affected by the reversion. It has not

identified evidence indicating that Bridge Aina Le'a sold its
ownership of the property outright, or that its residual
property interests following the transaction with DW Aina Le'a
were so "limited" as to be immune from the reversion order, or
that the State's view of the record is the only reasonable view.
*See Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 501 (9th
Cir. 1996) ("Judgment as a matter of law is appropriate 'if the
evidence and its inferences considered as a whole and viewed in
the light most favorable to the nonmoving party, can support
only one reasonable conclusion--that the moving party is
entitled to judgment not withstanding the verdict.'" (quoting
*Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775 (9th Cir.
1990))).

### 2. Bridge Aina Le'a Properly Asserted a Temporary Regulatory Takings Claim.

Bridge Aina Le'a's takings claim, which concerns a
zoning order later invalidated in state court, appears to fit
comfortably within the Supreme Court's established jurisprudence
on temporary regulatory takings. *See, e.g., Lucas v. S.C.
Coastal Council*, 505 U.S. 1003, 1008-14 (1992); *First English
Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 310,
318 (1987); *see also Res. Invs., Inc. v. United States*, 85 Fed.
Cl. 447, 468-69, 480-84 (2009). The State, however, argues that
takings claims are defective when based on erroneous findings of

fact by administrative agencies that sit in a "quasi-judicial capacity." ECF No. 385-1, PageID #s 9294-25. The State's argument is not entirely clear, but as this court understands it, it is without merit.

The State may be attempting to mischaracterize Bridge Aina Le'a's takings claim. *See* ECF No. 401, PageID # 9604. According to the State, the "situation here is that the Land Use Commission, in reverting the property, found that there was no 'substantial commencement' on the project. . . . The Supreme Court of Hawaii held that the finding of fact was erroneous. Plaintiff [wrongly] contends this is a taking." ECF No. 385-1, PageID #s 9294-95. But Bridge Aina Le'a's takings claim is not simply based on an erroneous factual finding; it is based on a reversion *order* issued by the Land Use Commission. *See* ECF No. 1-2, PageID #s 44, 48-50; *cf. Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005) (explaining that an "inquiry" into a "regulation's underlying validity" "is logically prior to and distinct from the question whether a regulation effects a taking"). The State conflates the reasoning behind the order-- the subject of separate litigation--with the effect of the order itself. It is the effect of the order that is the focus of takings analysis; if the Land Use Commission had engaged in the same fact-finding but decided not to issue the reversion order, there would be no takings claim. *See, e.g., Murr v. Wisconsin*,

137 S. Ct. 1933, 1942 (2017) (asking if government action "goes too far" and is unduly "burdensome" in its impact on property, not whether the action is factually supported and properly reasoned); *cf.* ECF No. 385-1, PageID # 9296 (conceding on behalf of the State that "there is no difference for [] takings analysis between the reversion being upheld or vacated"). There is nothing unusual or improper about Bridge Aina Le'a's temporary regulatory takings claim.

Alternatively, the State may be arguing that agencies should be immune from takings claims whenever their actions are based on erroneous findings of fact. *See* ECF No. 385-1, PageID # 9295. Neither precedent nor common sense supports such a rule, which would validate shoddy fact-finding by agencies. Takings claims can be brought regardless of whether government action is improperly reasoned or has been judicially nullified. *See First English*, 482 U.S. at 318; *Res. Invs.*, 85 Fed. Cl. at 468-69, 480-84; *see also* ECF No. 401, PageID # 9605 ("[T]he LUC cannot leverage its wrong . . . 'substantial commencement' determination into an absolution for violating Bridge's constitutional rights.").

Finally, the State may be attempting to extend to the sovereign the "quasi-judicial immunity" given to agency officials "who perform functions closely associated with the judicial process." *See Bridge Aina Le'a, LLC v. State of Hawaii*

12

*Land Use Comm'n*, 125 F. Supp. 3d 1051, 1074 (D. Haw. 2015)

(quoting *Duvall v. Cty. of Kitsap,* 260 F.3d 1124, 1133 (9th Cir.

2001)); *see also* ECF No. 401, PageID # 9603 (so interpreting the

State's argument).  The law does not recognize such an

extension, as the State appeared to recognize earlier in this

litigation.  In its Motion to Dismiss filed on July 27, 2011,

the State, while arguing that the Land Use *Commissioners* could

invoke quasi-judicial immunity, seemed cognizant that the

liability of the Land Use *Commission* (and thus the State) was

governed by a different immunity doctrine.  *See* ECF No. 14-1,

PageID #s 165, 194 (arguing that "the Commissioners in their

individual capacity are entitled to absolute quasi[-]judicial

immunity" and that "the LUC, as an agency of the State, has

sovereign immunity").

The State's initial understanding was correct.

Sovereign immunity, not quasi-judicial immunity, governs whether

State agencies can be sued for Takings Clause violations.  In

extending quasi-judicial immunity to certain "agency *officials*,"

the Ninth Circuit has observed that "[p]ermitting suits against

[] quasi-judicial decision makers would discourage knowledgeable

*individuals* from serving" their government, as the threat of

individual liability might undermine *their* "independent and

impartial exercise of judgment." *Buckles v. King Cty.*, 191 F.3d

1127, 1133, 1137 (9th Cir. 1999) (emphases added) (quoting

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993)).
These observations do not translate to a suit against a State
*agency*.

Moreover, the Ninth Circuit has held that State
agencies cannot invoke sovereign immunity when they are sued in
state court for Takings Clause violations. *See Jachetta v.
United States*, 653 F.3d 898, 909 (9th Cir. 2011) (explaining
that, under the Takings Clause, a State is constitutionally
"required to provide" just compensation "notwithstanding
sovereign immunity" (quoting *DLX, Inc. v. Kentucky*, 381 F.3d
511, 528 (6th Cir. 2004))). The present action was removed from
the state court it originated in to the federal forum by the
State. *See* ECF No. 1, PageID # 2.

This court will not announce a novel doctrine of
"quasi-judicial sovereign immunity" that would permit an end-run
around this constitutional guarantee. *See* ECF No. 401, PageID
# 9603 ("The State's proposed, legally unsupported expansion of
judicial or quasi-judicial immunity to the LUC as an entity, and
therefore to the State itself, would destroy the rights that the
self-executing Takings Clause . . . [is] supposed to
guarantee.").

The State draws a tenuous analogy between an agency's
factual error and a court's mistaken "findings of fact," which
the State says cannot "effect[uate] a taking." *See* ECF No.

14

385-1, PageID # 9295.  This analogy is unhelpful for three reasons.

First, as noted, Bridge Aina Le'a's takings claim concerns the effect of an administrative order, not any erroneous fact-finding that preceded it.

Second, the State assumes that an open legal question --whether judicial orders can effectuate takings--will be resolved against takings plaintiffs.  But "[t]he contours and viability of the theory of so-called 'judicial takings'--where a court decision may be deemed to have effectively taken property rights from an individual--[remain] unclear even in the courts of this country." *Jonna Corp. v. City of Sunnyvale*, No. 17-CV-00956-LHK, 2017 WL 2617983, at *6 (N.D. Cal. June 16, 2017) (quoting *Eliahu v. Israel*, No. 14-cv-01636-BLF, 2015 WL 981517, at *5 n.5 (N.D. Cal. Mar. 3, 2015)).

Third, even if a court agreed with the State's argument that judicial takings are impossible, the agreement would almost certainly be with respect to actual courts.  A broader holding extending to administrative or other nonjudicial actions would clash with numerous decisions explaining, for example, that the denial of an individual's permit application can effectuate a taking.  *See, e.g.*, *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1500 (9th Cir. 1990); *see also MacLeod v. Santa Clara Cty.*, 749 F.2d 541,

544-45 (9th Cir. 1984) ("The law is well settled [] that the application of a general zoning law to particular property effects a taking if 'the ordinance . . . denies an owner economically viable use of his land." (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980))).

The State fails to show that it is entitled to judgment as a matter of law on this ground.

### 3. The Jury's Finding of a *Lucas* Taking Is Supported by Adequate Evidence.

According to the State, the evidence at trial failed to show a *Lucas* taking. *See* ECF No. 385-1, PageID # 9296. The jury had good grounds for disagreeing. *See* ECF No. 373.

A *Lucas* taking occurs when "a regulation [] 'denies all economically beneficial or productive use of land.'" *Murr*, 137 S. Ct. at 1942 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 505, 617 (2001)). By contrast, there is no *Lucas* taking when "a regulation impedes the use of property without depriving the owner of *all* economically beneficial use." *Id.* at 1943 (emphasis added); *see also, e.g., Sierra Med. Servs. Alliance v. Kent*, 883 F.3d 1216, 1226 (9th Cir. 2018). On the issue of *Lucas* takings, this court instructed the jury as follows:

> Under Taking Analysis No. 1, you must determine whether the action of the Land Use Commission, before it was invalidated in the state courts, denied Bridge Aina Le'a all economically beneficial or productive use of its land.

> If you find that, while the Land Use
> Commission's reversion order was in effect,
> Bridge Aina Leʻa would not have been able to
> make any economically viable use of its
> property without a change in the law, you
> must find for Bridge Aina Leʻa with respect
> to Taking Analysis No. 1.  However, if you
> find that there were permissible uses of
> Bridge Aina Leʻa's property even with the
> development restriction in place, and if you
> further find that those uses were
> economically beneficial or productive, then
> you must find in favor of the Land Use
> Commission with respect to Taking Analysis
> No. 1.
>
> Evidence that the land had positive economic
> value notwithstanding the action of the Land
> Use Commission may be strong evidence of the
> availability of economically beneficial or
> productive uses.  However, a determination
> that the land had positive economic value
> does not, on its own, necessarily mean that
> no taking has occurred under Taking Analysis
> No. 1.  For example, a taking may occur when
> a regulation forbids development on a
> property and no competitive market exists
> for that property without the possibility of
> development, or if a landowner cannot sell
> the property to someone to use in accordance
> with the regulation.

ECF No. 372, PageID #s 7457-58.  This instruction was given with

the agreement of the parties.

The State asserts five reasons that no *Lucas* taking

occurred as a matter of law.  None has merit.

### a. Bridge Aina Le'a Satisfied Its Burden of Proof Under *Lucas* with Respect to the Economic Impact of the Reversion.

According to the State, a *Lucas* plaintiff must present evidence demonstrating the economic nonviability of every possible permissible use of its land. *See* ECF No. 385-1, PageID #s 9298-99. The State claims that Bridge Aina Le'a did not meet this burden, because at trial it "failed to consider" the economic value of "approximately 200" "unusual uses" that might be permitted in the agricultural district pursuant to "special permits." *See id.* Such "unusual uses" included:

> rock quarrying operations; cinder and sand
> mining facilities; concrete batching plants;
> construction waste facilities; landfills;
> public and private sewage treatment plants;
> gardens and zoos; schools; memorial parks;
> crematoriums; agricultural tourism
> facilities; commercial facilities; offices;
> gas stations; solid waste recycling
> facilities; private storage facilities;
> telecommunication facilities and structures;
> and power generation facilities (fossil fuel
> and renewable, including solar, wind,
> geothermal, hydropower, and biofuel[)].

*Id.* at PageID #s 9298-99. Bridge Aina Le'a did not present evidence specifically addressing the economic value of each of these potentially permissible uses; the State claims Bridge Aina Le'a therefore "failed to meet its burden of proof of showing the non-existence of economically beneficial uses." *Id.* at PageID # 9298.

The State would saddle Bridge Aina Leʻa with a Sisyphean task. Takings law requires less. Bridge Aina Leʻa presented evidence that a wide variety of potential permissible uses were not economically viable, including uses expressly permitted by statute or common or prevalent within the geographic area. *See* ECF No. 401, PageID #s 9607-09. Its expert, Bruce Plash, testified that "all uses permitted in the Agricultural District" by statute were not economically viable. *See id.* at PageID # 9608 (describing Plash's testimony). He also testified that "there were no agricultural operations on site or anywhere near the Property." *See id.* Bridge Aina Leʻa also put forward general evidence concerning the nature of the land. That evidence indicated that the land was akin to "a giant asphalt parking lot covered with big rocks," that it had "very poor" soil, and that it was "not suitable for agriculture." *See id.* at PageID #s 9607-08 (quoting ECF No. 382-10, PageID #s 7998, 8040). This presentation of evidence was sufficient.

When a party has the burden of proving a negative, it is not unusual for a court to accept a less-than-exhaustive showing. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that the burden of providing the absence of genuine issues of material fact may "be discharged by 'showing' --that is, pointing out to the district court--that there is an

19

absence of evidence to support the nonmoving party's case");
*United States v. Chevron Corp.*, No. C 94-1885 SBA, 1996 WL
444597, at *3 (N.D. Cal. May 30, 1996) (adopting a "shared
burden" approach to an attorney-client waiver issue to
"alleviat[e] the onerous burden . . . to prove a negative").  To
require more would, in many circumstances, be to demand the
impossible.  *See Weimerskirch v. Comm'r of Internal Revenue,* 596
F.2d 358, 361 (9th Cir. 1979) (recognizing the "practical"
difficulty of attempting "to prove a negative" (quoting *Elkins
v. United States*, 364 U.S. 206, 218 (1960))); *United States v.
Fei Lin*, 139 F.3d 1303, 1308 (9th Cir. 1998) (noting "the
difficulties inherent in requiring [a party] to prove a
negative" (citing *United States v. Dominquez-Mestas*, 929 F.2d
1379, 1384 (9th Cir. 1991))).

        Of course, if a takings defendant believes that a
permissible and economically viable use has been overlooked, it
may present evidence concerning that use.  *See, e.g.*, *Res.
Invs.*, 85 Fed. Cl. at 490.  If that presentation is successful,
the plaintiff's *Lucas* claim will fail.  *See, e.g.*, *Sierra Med.
Servs. Alliance*, 883 F.3d at 1226 (holding that there was no
*Lucas* taking because the regulation at issue did not "require
the Plaintiffs 'to sacrifice *all* economically beneficial uses'
of their property" (quoting *Lucas*, 505 U.S. at 1019-20)).  In
this case, however, the State put forward no evidence concerning

the economic viability of any alternative use.  It merely observed that "Hawaii law allows owners of agricultural land to obtain permits for unusual uses" and that Bridge Aina Leʻa "failed to consider" them.  *See* ECF No. 385-1, PageID # 9298 (emphasis omitted) (citing Haw. Rev. Stat. § 205-6).  The State presented no evidence, whether by expert or lay testimony, that *any* of these hypothetical uses was "economically viable."  *See* ECF No. 401, PageID # 9606; *see also Res. Invs.,* 85 Fed. Cl. at 490 (faulting the defendant's failure "to establish that its proposed alternatives were economically viable for plaintiffs, *i.e.,* that these uses would be profitable rather than result in a net loss").

The State's reference to special permits does not, as the State would have it, "destroy[] plaintiff's *Lucas* claim." *See* ECF No. 385-1, PageID # 9298.  Bridge Aina Leʻa's presentation of evidence concerning the economic nonviability of all statutorily permitted uses, in combination with the State's failure to present *any* evidence concerning the economic viability of potential "unusual" uses, adequately supports the jury's finding of a *Lucas* taking.  *Cf. Res. Invs.,* 85 Fed. Cl. at 489 (rejecting the defendant's proffer of "nominal uses" and "uses in name" only, which "turn out to be mere attorney argument without support in the record," and noting that "this court is bound to 'discount proposed [economically viable] uses

21

that do not meet a showing of reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future'" (alteration in original) (quoting *Loveladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153, 158 (1990))).

> **b.    *Lucas* Claims Are Not Negated by the Existence Of Permissible Uses that Could Generate Revenue Only at a Net Loss.**

According to the State, *Lucas* claims fail if there are any "permissible uses" that can "generate revenue and be productive," regardless of whether the uses are also "profitable."  ECF No. 385-1, PageID # 9297, 9299.  The State's proposal makes a nullity of the *Lucas* test.

According to the State, Bridge Aina Leʻa's *Lucas* claim should fail in the wake of Bruce Plash's uncontradicted testimony that some permissible uses in the agricultural district, like wind farming, could "generate[] revenue" while losing money.  *Id.* at PageID #s 9297-99.  But uses resulting in losses are not automatically "economically *beneficial* uses." *See Sierra Med. Servs. Alliance*, 883 F.3d at 1226 (emphasis added) (quoting *Lucas*, 505 U.S. at 1019-20); *see also, e.g., Murr*, 137 S. Ct. at 1943 (describing *Lucas* takings as regulations that deprive "the owner of all economically *beneficial* use" (emphasis added)); *Tahoe-Sierra Pres. Council,*

*Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330 (2002)
(similar); *Palazzolo*, 533 U.S. at 617 (similar); *Res. Invs.,* 85
Fed. Cl. at 490 (faulting the defendant for failing "to
establish that its proposed alternative[ uses] . . . would be
profitable rather than result in a net loss").

It is hard to imagine any zoning ordinance that would
run afoul of the State's test.  Consider an ordinance that
banned the "construction of occupiable improvements" on land,
*see Lucas*, 505 U.S. at 1008-09, and also prohibited living on
the land.  Even in this highly restricted situation, there might
be some "permissible" uses that could "generate revenue."  *See*
ECF No. 385-1, PageID # 9297.  The landowner, for example, might
purchase rare Picasso paintings to lay on the land and sell
viewing rights for one dollar.  This "Picasso use" would
generate ticket revenue, probably at an enormous net loss.
Under the State's view of *Lucas*, the landowner would have no
*Lucas* claim.  This reading of *Lucas* would make a nullity of the
very concept of a *Lucas* taking.  Even if *Lucas* claims are rarely
viable, they cannot be impossible to establish.

"[T]he term 'economically viable use' has yet to be
defined with much precision."  *Del Monte Dunes at Monterey, Ltd.
V. City of Monterey*, 95 F.3d 1422, 1432 (9th Cir. 1996) (quoting
*Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 616 (1993)),
*aff'd*, 526 U.S. 687 (1999).  The Ninth Circuit, however, has

consistently understood the term to imply positive market value. For example, the Ninth Circuit has adopted a test applied by the Second Circuit that asks "whether the property use allowed by the regulation is sufficiently desirable *to permit property owners to sell the property to someone for that use*." *Id.* at 1433 (emphasis added) (quoting *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984)). Put another way, the key question is whether a "competitive market exists" for the present uses. *Id.* at 1433; *see also Park Ave. Tower Assocs.*, 746 F.2d at 139. The Ninth Circuit's focus on positive market value strongly implies that it does not understand "economically beneficial use" to include a use resulting in an economic loss. Nothing the Supreme Court has said disrupts this basic understanding. *See City of Monterey v. Del Monte Dunes, Ltd.*, 535 U.S. 687 (1999).

In advancing its view of *Lucas* law, the State cites *Palazzolo v. Rhode Island*, 505 U.S. 606 (2001). In *Palazzolo*, the Supreme Court allowed dismissal of a *Lucas* takings claim involving Rhode Island's wetlands regulations on the ground that the regulations did not deprive Palazzolo of "all economically beneficial use" of his property. *Id.* at 630. The Court noted that Palazzolo retained the ability "to build a substantial residence on [his] 18-acre parcel," and accepted the lower court's finding that this "development value" was worth

"$200,000." *Id.* at 630-31. The State attempts to recast *Palazzolo* as nullifying a *Lucas* claim on the sole ground that "houses could have been built on property." *See* ECF No. 385-1, PageID # 9298 (citing *Palazzolo*, 533 U.S. at 631). The State overlooks the positive economic value of the use--some $200,000 --that the Supreme Court expressly observed was more than "a token interest." *See Palazzolo*, 533 U.S. at 631.

*Palazzolo* in no way suggests that the ability to build a home, at whatever cost, will invariably defeat a *Lucas* claim. The State points out that Bridge Aina Le'a may have been able to construct a number of residences on the 1,060-acre property despite the agricultural classification. *See* ECF No. 385-1, PageID # 9298. *But see* ECF No. 401, PageID #s 9610-11 (arguing otherwise). Even if that is so, other evidence (as the State concedes) indicated that the construction of such residences "would not be profitable." *See* ECF No. 385-1, PageID # 9298 (discussing the testimony of Bruce Plasch). Putting in power, water, and sewer lines would have been costly, and cutting through solid lava rock to lay a foundation would not have been easy. The jury could have reasonably believed that the cost of constructing houses would have been prohibitive. The State is not entitled to judgment as a matter of law on this issue.

### c. *Lucas* Does Not Require that Property Be Left Entirely Without Value.

The State also claims that Bridge Aina Leʻa's *Lucas* claim fails because the evidence demonstrated "that the property retained millions of dollars of worth in the agricultural district." ECF No. 385-1, PageID # 9300. The State's argument rests on another mischaracterization of takings law: a false belief that *Lucas* takings *demand* "a 'complete elimination of [economic] value.'" *See id.* (quoting *Tahoe-Sierra*, 535 U.S. at 330).

Economic worthlessness is undoubtedly sufficient to establish a *Lucas* taking. *See Lucas*, 505 U.S. at 1007, 1016 n.7. As the Supreme Court explained in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002), "compensation is required when a regulation deprives an owner of '*all* economically beneficial uses' of his land." 535 U.S. at 330. "Under that rule, a statute that 'wholly eliminate[s] the value' of [a] fee simple title clearly qualifie[s] as a taking." *Id.* (quoting *Lucas*, 535 U.S. at 330).

But demonstrating economic worthlessness is not necessary to stake out a *Lucas* claim. *See* ECF No. 401, PageID # 9606. The Ninth Circuit has explained that "[f]ocusing the economically viable use inquiry solely on market value or on the fact that a landowner sold his property for more than he paid"

is "inappropriate." *Del Monte Dunes at Monterey*, 95 F.3d at 1432-33. "Although the value of the subject property is relevant to the economically viable use inquiry, our focus is primarily on use, not value." *Id.; see also, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 780 (9th Cir. 2000) (explaining that positive economic value "provides strong evidence of the availability of 'economically beneficial or productive uses'"), *aff'd*, 535 U.S. 302 (2002).[1]  "Indeed, several courts have found a taking even where the 'taken' property retained significant value." *Del Monte Dunes at Monterey*, 95 F.3d at 1433 (citations omitted).

Economic value can be positive despite the absence of an economically beneficial use if there is no possibility for development absent a change in the law.  That is why the Ninth Circuit maintains that the ability to sell property is an economically beneficial use only when "*the property use allowed by the regulation is sufficiently desirable to permit property owners to sell the property to someone for *that* use*"; if "no competitive market exists for the property *without the possibility of [a legal change permitting] development*, a taking

---

[1] A portion of the Ninth Circuit's *Tahoe-Sierra* decision was later overruled on other grounds by the en banc decision in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012). That portion does not affect the analysis relied on here.  *See id*. at 390 n.4 (overruling *Tahoe-Sierra*, 216 F.3d at 786-88, to the extent it suggested a position contrary to *Gonzalez* with respect to the doctrine of law of the case).

may have occurred." *Del Monte Dunes at Monterey*, 95 F.3d at 1433 (emphases added) (quoting *Park Ave. Tower Assocs.*, 746 F.2d at 139). In this case, the jury could have reasonably concluded that any residual market value was not the result of some extant, permissible, and economically beneficial use, but derived instead from the chance that the land would be reclassified as urban. Thus, despite the land's positive market value in the agricultural district, the jury's finding of a *Lucas* taking is still supported by adequate evidence.

The Ninth Circuit's decision in *Horne v. U.S. Department of Agriculture*, 750 F.3d 1128 (9th Cir. 2014), *rev'd on other grounds*, *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), is not to the contrary. *Horne* dealt with a complex regulatory scheme that required raisin producers to divert a portion of their yields to a raisin reserve maintained by the Department of Agriculture. *See id.* at 1132. Whenever the agency sold these reserves, usually in noncompetitive markets, the producers received a pro rata share of the sales less administrative costs. *See id.* Sometimes that pro rata share was "significant; in other years it [was] zero." *Id.* In a portion of the *Horne* decision that was not reviewed by the Supreme Court, the Ninth Circuit concluded that the raisin

regulations did not effectuate a *Lucas* taking.[2]  The Ninth

Circuit stated in a footnote that "[i]f the property [affected

by a regulation] retains any residual value after the

regulation's application, *Penn Central* applies."  *Id.* at 2419

n.17.  This statement came after the Ninth Circuit had already

determined that the regulations did not cause the Hornes to

"lose all economically valuable *use* of their [] property."  *Id.*

at 1140 (emphasis added).  Consequently, *Horne* is not a case in

which the Ninth Circuit relied solely on residual value to deny

a *Lucas* taking claim--and the reasoning in *Del Monte Dunes* was

binding on the *Horne* panel in any event.

> ### d. Retrospectively Temporary Regulations Can Effectuate *Lucas* Takings.

According to the State, Bridge Aina Leʻa's *Lucas* claim

also fails because the Hawaii Supreme Court nullified the Land

Use Commission's reversion order.  *See* ECF No. 385-1, PageID

# 9303.  This argument is based on the State's broad reading of

the Supreme Court's decision in *Tahoe-Sierra*, which the State

characterizes as holding that that any "temporary" government

---

[2] The Supreme Court reversed the Ninth Circuit's
determination that there was no taking on the ground that the
Ninth Circuit had wrongly rejected the plaintiff's *Loretto*
theory.  *See Horne*, 135 S. Ct. at 2427-28.  The Supreme Court
did not consider the separate *Lucas* taking theory, which the
Hornes had not relied on when petitioning for certiorari.  *See
id.*

regulation cannot be challenged under *Lucas*.  *See id.* (citing 535 U.S. at 302).

The State is ignoring an important distinction between facially temporary regulations and retrospectively temporary regulations.  In *Tahoe-Sierra*, the Supreme Court held that regulations with built-in expiration dates generally cannot effectuate *Lucas* takings (also known as categorical or *per se* takings).  *See* 535 U.S. at 320 (holding that a "temporary moratorium" on development, set to expire on the adoption of a land use plan, could not qualify for *Lucas* treatment).  The Ninth Circuit has yet to decide whether, in a post-*Tahoe-Sierra* world, a *temporally unbounded* regulation that is amended, repealed, or annulled in court can effectuate a *Lucas* taking.  But the Ninth Circuit's decision in *Tahoe-Sierra* (which was affirmed by the Supreme Court), as well as the Supreme Court's decisions in *First English*, *Lucas*, and *Tahoe-Sierra*, indicate that such "retrospectively temporary regulations" can still result in categorical takings.

The Supreme Court confronted a retrospectively temporary land-use regulation in *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304 (1987).  The unusual posture of the case required the Court to assume that the regulation "took" plaintiff's property by denying him "all use" of it.  *Id.* at 311-12.  The Court also assumed that the

provision remained in effect until it was "ultimately invalidated by the courts." *Id.* at 310. Given these assumptions, *First English* held that the eventual "abandonment by the government [of the regulation, following its judicial invalidation, still] require[d] payment of compensation for the period of time during which [the] regulation[] den[ied] [the] landowner all use of his land." *Id.* at 318.

The analysis in *First English* was necessarily restricted to the issue of just compensation. But the Court still suggested that a retrospectively temporary regulation denying "all use" of property would effectuate a categorical taking. Analogizing the land-use regulation at issue to cases such as *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), in which "the government [] temporarily exercised its right to use private property," the Court declared that such "'[retrospectively] temporary' takings . . . are not different in kind from permanent takings."[3] *First English*, 482 U.S. at 318.

Five years later, in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), the Supreme Court once again

---

[3] This court has inserted the bracketed word "retrospectively" in the quotation to match the parlance used in this Order. *First English* defined "'temporary' regulatory takings" as "regulatory takings which are ultimately invalidated by the courts." 482 U.S. at 310. It was not until *Tahoe-Sierra* that *retrospectively* temporary regulations were distinguished from *facially* temporary regulations.

confronted retrospectively temporary government action, this
time expressly holding that such action effectuated a
categorical taking.  The challenged statute, at the time it was
enacted, "flatly prohibited" the "construction of occupiable
improvements" on a barrier island known as the Isle of Palms,
where Lucas had property.  *Id.* at 1008-09.  The lower court
determined that this statute rendered Lucas's parcel
"valueless"; this finding went unchallenged in the Supreme
Court.  *Id.* at 1009.  While the appeal was pending, the South
Carolina legislature amended the statute to permit some future
development on the Isle of Palms.  The Supreme Court held that
the statute still effectuated a categorical taking, explaining
that such an amendment had no effect on whether there had been a
temporary categorical taking during "the 1988-1990 period" when
the original statute was in effect.  *Id.* at 1010-14 (citing
*First English*, 482 U.S. 304).[4]

     The litigation in *Tahoe-Sierra*, unlike *First English*
and *Lucas*, involved a facially temporary development moratorium
on property near Lake Tahoe.  The Ninth Circuit noted that there
was "no evidence that owners or purchasers of property in the
basin anticipated that the temporary moratorium would continue

---

     [4] The Supreme Court's citation to *First English*
suggests that, had it been asked to consider the issue, it would
have held that the retrospectively temporary regulation in that
case effectuated a categorical taking.

indefinitely." 216 F.3d at 782. The Ninth Circuit assumed *arguendo* that the temporary moratorium "prevented all development in the period during which it was in effect." *Id.* at 780 n.20. The court held that the moratorium nonetheless "did not effect a categorical taking" because it "did not deprive the plaintiffs of all of the [economic] value or use of their property." *Id.* at 782.

In reaching this conclusion, the Ninth Circuit emphasized the limited duration of the regulation, explaining that the "temporary moratorium did not deprive the plaintiffs of all 'use' of their property" and had no effect on *future* uses whatsoever. *Id.* Moreover, the temporary moratorium "did not render the plaintiff's property valueless" because the "anticipat[ion]" that the moratorium would end ensured that the property retained "substantial present value" based on the value of the future uses. *Id.* at 781.

The Ninth Circuit then drew a distinction between facially and retrospectively temporary regulations:

> This "economic reality is precisely what
> differentiates a permanent ban on
> development, *even if subsequently
> invalidated*, from a temporary one. . . .
> [W]hen a permanent development ban (like the
> one at issue in *Lucas*) is enacted, the value
> of the affected land plummets, on account of
> the fact that the ban bars all future
> development of the property."

*Id.* at 781 n.26 (emphasis added).

On certiorari, the Supreme Court seemed to rely on the same distinction. The Court described *Lucas* as having held that a "permanent 'obliteration of the value' of a fee simple estate constitutes a categorical taking." *Tahoe-Sierra,* 535 U.S. at 331. It noted that *Lucas* could "not answer the question whether a regulation prohibiting any economic use of land *for a 32-month period* has the same legal effect." *Id.* at 331-32 (emphasis added).

The Court then articulated a professedly "narrow" holding that "a temporary regulation that, while in effect, denies a property owner all viable economic use of her property" does not always effectuate a *Lucas* taking. *Id.* at 307, 320. The Court again distinguished *Lucas*, noting that "[a]s the statute read at the time of trial, it effected a taking that 'was unconditional and permanent.'" *Id.* at 329-30 (citing *Lucas*, 505 U.S. at 1012).[5] But "[l]ogically, a fee simple estate cannot be rendered valueless by a *temporary* prohibition on economic use, because the property will recover value as soon as the prohibition" lapses. *Id.* at 332 (emphasis added). To

_____

[5] The Court focused on how the statute read "at the time of trial." *Tahoe-Sierra,* 535 U.S. at 329. *But see Res. Invs.*, 85 Fed. Cl. at 484 (holding in the context of a challenge to a permit denial that was later invalidated that whether there was "a categorical taking of the parcel as a whole, a partial taking [under *Penn Central*], or no taking at all depends *only* on the effect of that particular denial on plaintiffs' property interests *at the time of the denial*" (second emphasis added)).

permit recovery on a categorical theory would mean violating the parcel-as-a-whole-rule; i.e., the rule that a regulation should be analyzed based on its effect on the parcel "in its [temporal] entirety." *Id.* at 327.

The reasoning driving *Tahoe-Sierra* applies only to facially temporary regulations, not to regulations that are temporary only in retrospect. Setting aside regulations with outlandish time horizons, it is impossible for a facially temporary regulation to destroy all economically beneficial use of property, as future uses will retain some present value. *See id.* at 332; *Tahoe-Sierra*, 216 F.3d at 728. Thus, *Tahoe-Sierra*'s "narrow" holding makes sense. The situation changes, however, when a regulation is facially unbounded. Because such a regulation will affect the permissibility of present *and* future uses, it is possible that the landowner has retained *no* permissible economically beneficial uses, and a categorical takings claim may be viable. *See Tahoe-Sierra*, 216 F.3d at 781 n.26; *see also Res. Invs.,* 85 Fed. Cl. at 480-84.

The Supreme Court has recognized that a later amendment to a regulation or a judicial invalidation cannot erase any taking "for the period of time during which regulations deny a landowner all use of his land." *First English*, 482 U.S. at 318; *see also Lucas*, 505 U.S. at 1010-14; *cf*. *Tahoe-Sierra*, 535 U.S. at 328 ("[W]here the government's

activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." (quoting *First English*, 482 U.S. at 321)).

Similarly, only facially temporary regulations can trigger violations of the parcel-as-a-whole rule.  As the Supreme Court explained in *Tahoe-Sierra*, a regulation with a 32-month duration can effectuate a categorical taking only if a court were to "effectively sever a 32-month segment from the remainder [of the fee], and then ask whether that segment has been taken in its entirety."  535 U.S. at 331.  Such "conceptual severance," the Supreme Court observed, would violate the parcel-as-a-whole rule.  *Id.*  By contrast, an unbounded regulation "extinguish[es] present *and future* use interests." *Res. Invs.*, 85 Fed. Cl. at 481; *see also Tahoe-Sierra*, 216 F.3d at 781 n.26.  Accordingly, one need not slice the parcel into temporal segments to conclude that a categorical taking took place while the regulation was in effect.

In sum, *Tahoe-Sierra* is properly understood as creating an exception to the rule outlined in *First English* and *Lucas.*  The amendment, repeal, or nullification of government action cannot nullify the duty of the government to provide compensation "for the period of time during which regulations

36

deny a landowner all use of his land." *See First English*, 482 U.S. at 318. But since facially temporary regulations cannot, by definition, destroy the economic viability of future uses, they cannot be *Lucas* takings.

The only other federal court to have articulated a definitive position on this issue reached a similar conclusion.[6] In *Resource Investments, Inc. v. United States*, 85 Fed. Cl. 447 (2009), the plaintiffs argued that a permit denial constituted a categorical taking under *Lucas*, even though the denial had been overturned in court. *See id.* at 484. The defendants, like the State in this case, replied that "there is no such thing as a temporary categorical taking." *Id.* at 468. The court in *Resource Investments* sided with the plaintiffs. It drew a distinction between facially temporary regulations and retrospectively temporary regulations, holding that the latter can still undergird a *Lucas* claim:

> [In *Tahoe-Sierra*, the regulations at issue]
> were expressly temporary when enacted . . .

---

[6] The Federal Circuit has addressed this issue in dicta, "refrain[ing] from ruling out the rare possibility that a temporary categorical taking could exist." *Sartori v. United States*, 67 Fed. Cl. 263, 275 (2005); *see also Seiber v. United States*, 364 F.3d 1356, 1368 (Fed. Cir. 2004) ("[O]ur case law suggests that a temporary categorical taking may be possible. In *Boise Cascade*[,] we explained that the Supreme Court may have only 'rejected [the] application of the per se rule articulated in *Lucas* to temporary development moratoria.'" (third alteration in original) (internal citations omitted) (quoting *Boise Cascade v. United States*, 296 F.3d 1339, 1350 (Fed. Cir. 2002))).

. This, as the Supreme Court explained, was
not a taking of the parcel of the whole
because the landowners' future interests,
though diminished in value, always remained
intact.  Thus, at the moment the moratorium
took effect, it effected a taking of
property values for a finite and limited
segment of time rather than permanently and
indefinitely.

In contract, when [the statute at issue]
took effect in *Lucas*, it prohibited any and
all further development of the affected
property, extinguishing the present *and
future* use interests rather than merely
diminishing their value.  Although the South
Carolina Legislature might have abrogated
the [statute] by subsequent statute or
amended it, . . . the [statute] was not
temporary at the time it was enacted. . . .
[Thus, the statute] would and could only be
temporary *in retrospect*, as it was permanent
by its own text.

*Id.* at 480-81 (internal citations omitted) (emphases in

original).  Because "subsequent events cannot change what

property interests the taking took when it accrued[,]" the court

held that "applying *Lucas* to plaintiffs' [retrospectively]

temporary regulatory takings claim would [not] violate *Tahoe-

Sierra*."  *Id.* at 469, 484.

The reversion order at issue here, like the statute in

*Lucas* and the permit denial in *Resource Investments*, "was

permanent by its own text."  *See Res. Invs.*, 85 Fed. Cl. at 481.

It became "temporary in retrospect" only after the Hawaii

Supreme Court intervened.  *See id.* (emphasis omitted); *see also*

ECF No. 401, PageID # 9615.  Bridge Aina Le'a is not precluded

from litigating its *Lucas* claim solely because the reversion order was overturned in court.

> **e. The Court Properly Instructed the Jury that the Denominator Was the 1,060-Acre Parcel.**

The State's final argument concerning Bridge Aina Le'a's *Lucas* claim is that this court "erred in instructing the jury" that it should examine the impact of the reversion order on the reclassified 1,060-acre tract, rather than assessing whether the "entire 3,000 acre tract" owned by Bridge Aina Le'a was deprived of any economically viable use. ECF No. 385-1, PageID # 9301. This argument requires some unpacking, but is similarly without merit.

The State's argument implicates what is known as the "denominator problem" in takings law, which asks what "the proper unit of property [is] against which to assess the effect of the challenged governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1938 (2017). In *Murr*, the Supreme Court articulated a number of factors that a court should weigh in setting the proper denominator.[7] *See id.* at 1946-49. After

---

[7] The denominator issue was not expressly discussed in the State's earlier motion for judgment as a matter of law, but the State presents the issue as subsumed in the portion of its motion challenging the State's *Lucas* claim. The court's recollection is that the denominator issue was first actually discussed when jury instructions were settled. The State had included in its proposed instructions its suggested denominator instruction.

considering these factors, this court instructed the jury, over the State's objection, as follows:

> In determining whether the Land Use Commission's action amounted to a taking, you should restrict your analysis to the parcel of land that was the subject of the Land Use Commission's reversion order (approximately 1060 acres). You should not examine what, if any, impact the Land Use Commission's action had on any other parcel of land.

ECF No. 372, PageID # 7454.

The above instruction was this court's modification, over the State's objection, of the following instruction submitted by the State:

> When performing your taking analyses, you must first determine "whether reasonable expectations about property ownership would lead the plaintiff to anticipate that its land should be treated as one parcel, or, instead, as separate tracts." To make this determination, you should consider three factors.
>
> First, you must "give substantial weight to the treatment of the land, in particular how it is bounded or divided, under state and local law. The reasonable expectations of an acquirer of land must acknowledge legitimate restrictions affecting his or her subsequent use and dispensation of the property."
>
> Second, you "must look to the physical characteristics of the" plaintiff's []property. These include the physical relationship of any distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment." You may consider whether "the property is located in

> an area that is subject to, or likely to
> become subject to, environmental or other
> regulations."
>
> Third, you "should assess the value of the
> property under the challenged regulation,
> with special attention to the effect of the
> burdened land on the value of other
> holdings.  Though a use restriction may
> decrease the market value of the property,
> the effect may be tempered if the regulated
> land adds value to the remaining property,
> such as by increasing privacy, expanding
> recreational space, or preserving
> surrounding natural beauty."

ECF No. 323, PageID #s 6786-87 (quoting *Murr*, 137 S. Ct. at 1945-46.)

The State believes that the court erred by either 1) failing to submit the denominator question and the *Murr* factors to the jury, or 2) by not holding that the denominator as a matter of law was the "entire 3,000 acre" parcel owned by Bridge Aina Le'a, approximately 2,000 acres of which is classified as agricultural land.  *See* ECF No. 385-1, PageID #s 9302, 9314-15. The State asks the court "to rectify [these] error[s]" by either declaring that the entire 3,000 acres is the proper denominator --which the State believes would negate Bridge Aina Le'a's *Lucas* claim--or by ordering a new trial and submitting the *Murr* factors to the jury.  *Id.*

The court is not persuaded that it erred.  The court resolved the denominator question itself, rather than submitting it to the jury because the "relevant parcel determination is a

41

question of law based on underlying facts." *See Lost Tree Vill. Corp. v. United States*, 707 F.3d 1286, 1292 (Fed. Cir. 2013) (citing *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1380 (Fed. Cir. 2000)). In *Murr,* the Supreme Court described the denominator question as an issue for courts to resolve, and indeed resolved the question itself. *See* 137 S. Ct. at 1950. *Murr* further analogized the denominator problem to the issue of defining "property rights under the Takings Clause." *Id.* at 1944-45. That is another "question of law for the judge" that is based on underlying facts. *Phillips v. Marion Cty. Sherriff's Office*, 494 Fed. App'x 797, 799 (9th Cir. 2012); *see also Sierra Med. Servs. Alliance v. Kent*, 883 F.3d at 1223-25 (holding in a takings case and as a matter of law that an interest in reimbursement is a Fifth Amendment property interest). This court did not err in declining to submit the ultimate *Murr* balance to the jury. *See* ECF No. 385-1, PageID # 9315.

The State also complains that this court resolved the denominator question "without any motion by plaintiff." ECF No. 385-1, PageID # 9314. When a case implicates a denominator problem, the timing of its resolution will sometimes depend on the nature of any factual disputes in the case. In some cases, it will be possible for a court to resolve denominator issues before evidence is presented at trial. *See, e.g., Kaiser Dev.*

42

*Co. v. City & Cty. of Honolulu*, 649 F. Supp. 926, 948 (D. Haw. 1986) (holding on summary judgment that in "this case, Queen's Beach is to be considered as a separate parcel for the purposes of determining whether there has been a taking"), *aff'd*, 898 F.2d 112 (9th Cir. 1990) (affirming for the "reasons stated" in the district court's opinion). But because the *Murr* balance depends on underlying facts, it is not always possible to perform that balancing before trial. *Cf. Am. Sav. & Loan Ass'n v. Marin Cty.*, 653 F.2d 364, 367 (9th Cir. 1981) (reversing the district court's denominator decision because there had been no resolution of the underlying "factual issue" of whether the two parcels would have been "treated separately" had plaintiff "submit[ted] a development plan").

In this case, the parties did not raise the denominator issue before trial, and the question came before the court when the court addressed the State's proposed jury instruction on the issue. *See* ECF No. 323, PageID # 6786. By that time, the court had heard evidence presented at trial. Based on that evidence, the court instructed the jury that the proper denominator was the 1,060-acre parcel. *See* ECF No. 372, PageID # 7454. In so doing, the court followed the procedure outlined by the Seventh Circuit in *United States v. 105.40 Acres of Land, More or Less, in Porter County, State of Indiana*, 471 F.2d 207 (1972), under which "the district judge should--upon

43

proper consideration of evidence--decide the factual question whether the [] parcels . . . were functionally separate parcels . . . [and] should then instruct the jury . . . consistent with [her] preliminary factual determination." *Id.* at 212.

Besides questioning the court's decision to select the denominator itself, the State also takes issue with what denominator the court selected. *See* ECF No. 385-1, PageID # 9301 ("Under *Murr*, the denominator of the property is the entire 3,000 acre project area, not merely the 1,060 acre urban portion"). The court is not persuaded that its selection was in error.

In setting the denominator, a court must ultimately decide "whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Murr*, 137 S. Ct. at 1945. "The inquiry is objective, and the reasonable expectations at issue derive from background customs and the whole of our legal tradition." *Id.* The plaintiff bears the burden of showing that parcels "have been, or would be, treated separately[.]" *See Am. Sav. & Loan Ass'n*, 653 F.2d at 372.

Three factors affect the appropriate denominator. "First, courts should give substantial weight to the treatment of the land, in particular how it is bounded or divided, under

44

state law." *Murr*, 137 S. Ct. at 1945.  In so doing, courts
should look to "whether and to what degree the State's law has
accorded legal recognition and protection to the particular
interest in land with respect to which the takings claimant
alleges a diminution" and further weigh whether the State's
treatment of the land "accord[s] with other indicia of
reasonable expectations about property."  *Id.* at 1946-47.
Whether the land was treated separately and how any boundary
lines were drawn prior to the "landowner's acquisition . . .
[are among] the objective factors that most landowners would
reasonably consider in forming fair expectations about their
property."  *Id.* at 1946.  If the State law differentiates
between parcels, that weighs in favor of narrowing the
denominator; if the State treats them as an undifferentiated
whole, that weighs in favor of expanding the denominator.  *See*
*id.* at 1948.

        "Second, courts must look to the physical
characteristics of the landowner's property."  *Id.* at 1946.
"These include the physical relationship of any distinguishable
tracts, the parcel's topography, and the surrounding human and
ecological environment."  *Id.*  The more physical similarity, the
more a landowner might reasonably "anticipate that his holdings
would be treated as one parcel" rather than as separate parcels.
*Id.* at 1946, 1948-49.

"Third, courts should assess the value of the property under the challenged regulation, with special attention to the effect of burdened land on the value of other holdings." *Id.* at 1946. If "the market value of the [surrounding] properties may well increase . . . [due to] development restraints," that "may counsel in favor of treatment as a single parcel." *Id.* In other words, a court should ask if there is "a special relationship between the holdings" such that "the regulated lands add value to the remaining property" by, for example, "increasing privacy, expanding recreational space, or preserving surrounding natural beauty." *Id.*

These factors, especially the first requirement that a court give "substantial weight to the treatment of land . . . under state law," *id.* at 1946, coincide with how the Ninth Circuit has historically resolved denominator issues. One touchstone in Ninth Circuit precedent has been that a denominator should be split if 1) state law "adopt[s] different zoning designations for each parcel" and 2) the parcels are "treated separately" when "development plans are submitted and considered." *Am. Sav. & Loan Ass'n*, 653 F.2d at 370-71. *American Savings and Loan Association v. County of Marin*, 653 F.2d 364 (9th Cir. 1981), drew this rule-of-thumb from the Supreme Court's 1928 decision in *Nectow v. City of Cambridge*, 277 U.S. 183 (1928), in which:

> a landowner owned a tract of 140,000 square
> feet. Of that, 29,000 square feet were
> zoned residential and the rest were
> unrestricted. The landowner contended the
> residentially zoned land had been taken. In
> judging the validity of the ordinance as a
> police power measure, the court considered
> the smaller tract separately from the larger
> tract.

*Am. Sav. & Loan Ass'n*, 653 F.2d at 370 (discussing *Nectow*).

The Ninth Circuit applied the *American Savings* rule in

*Kaiser Development Co. v. City & Cty. of Honolulu*, 649 F. Supp.

926 (D. Haw. 1986), *aff'd*, 898 F.2d 112 (9th Cir. 1990).[8]

Recognizing that "differential zoning tend[s] to require []

separate evaluation for takings purposes," the Ninth Circuit

agreed with the district court's conclusion that, "under the

facts of this case, Queen's Beach is to be considered as a

separate parcel for the purposes of determining whether there

has been a taking." 649 F. Supp. at 947 n.30, 948 (citing *Am.*

*Sav. & Loan Ass'n*, 653 F.2d at 371). The district court

explained:

> Queen's Beach is non-contiguous since it is
> separated from the rest of Hawaii Kai by a
> road; Queen's Beach has not been developed
> by Bishop as part of the residential
> community of Hawaii Kai; Bishop and Kaiser
> have always considered Queen's Beach a
> separate area on which they seek to build a
> resort. *Most importantly, the City has
> treated Queen's Beach separately for zoning*

[8] The citations refer to the district court's opinion
because the Ninth Circuit affirmed "for the reasons stated by
Judge King." *See Kaiser Dev. Co.*, 898 F.3d at 113.

47

>*and planning purposes.* The City has zoned
>Queen's Beach for preservation uses, while
>most of the rest of Hawaii Kai is zoned
>residential, and Queen's Beach has
>consistently had a different land use
>designation from the rest of Hawaii Kai.
>Under the General Plans of 1960 and 1964,
>under the DLUMs of 1964 and 1966, under the
>1973 revised City Charter, and under the
>1983 Development Plan, for example, Queen's
>Beach has been designated either
>commercial/resort or park/preservation,
>while the rest of Hawaii Kai has been
>designated primarily for residential use.
>In summary, under the facts of this case,
>Queen's Beach is to be considered a separate
>parcel . . . .

*Id.* at 947-48 (emphasis added).

Under *Murr*, *American Savings*, and *Kaiser Development*,
the appropriate denominator is the 1,060 acres classified as
urban, not also the 2,000 or so acres that was classified as
agricultural. The State, for periods relevant here, had adopted
"different zoning designations for each parcel." *See Am. Sav. &
Loan Ass'n*, 653 F.2d at 370-71. The parties agree that the
1,060-acre parcel was "the only part classified for Urban use
when Bridge [Aina Leʻa] bought the [3,000-acre] Property." ECF
No. 401, PageID # 9613; ECF No. 385-1, PageID # 9302 ("[O]nly
[the] 1,060 acres of land [w]as urban"). The Land Use
Commission's sole attempt to shift its classification was
nullified by the Hawaii Supreme Court. *See DW Aina Lea Dev.,
LLC v. Bridge Aina Lea, LLC.*, 134 Haw. 187, 213-216 (2014).

Thus, the 1,060-acre parcel has been deemed separable from the rest of the acreage. *See Kaiser Dev. Co.*, 659 F. Supp. at 948.

The two parcels have also been "treated separately" when "development plans are submitted and considered." *See Am. Sav. & Loan Ass'n*, 653 F.2d at 370-71. Bridge Aina Le'a's development plans, its filings with the Land Use Commission, and the Land Use Commission's decisions and orders consistently distinguished between the two parcels and evinced a plan to develop the 1,060-acre parcel separately. *See* ECF No. 382-11, PageID # 8063 (discussing Bridge Aina Le'a's development plan pursuant to which "[t]he areas outside of the State Land Use 'Urban' District, which are designated as 'Agricultural' by the State Land Use Commission, will be developed as future phases and therefore remain, for the most part, in their current zoning and land use configuration" while the development in the urban district proceeds); *see also, e.g.*, ECF No. 382-1, PageID #s 7740, 7742; ECF No. 382-3, PageID # 7773; ECF No. 382-6, PageID #s 7891-95; ECF No. 382-11, PageID #s 8058-59. Based on the evidence presented at trial, it is clear that the urban lands were treated "separately" for "planning purposes." *See Kaiser Dev. Co.*, 649 F. Supp. at 948.

The State's submission of "[n]ewly discovered evidence" in the form of an Environmental Impact Statement Preparation Notice ("EISPN") submitted by Bridge Aina Le'a to

the County of Hawaii Planning Department only serves to confirm these conclusions. *See* ECF No. 385-1, PageID # 9315. The EISPN again distinguishes between the "approximately 1,933 acres of the Project Area designated Agriculture" and the "1,060 acres . . . in the Urban District." *See* ECF No. 385-2, PageID #s 9326, 9330. It describes development plans that will "focus first on the Urban lands, and later on the area [] in the Agricultural district." *See* ECF No. 385-2, PageID # 9329 ("[It is hoped] that development of the Urban area can proceed subject to County approvals. The EIS can also serve as a source of information for a petition to the State Land to reclassify land owned by Bridge in the Agricultural District to Rural, after which a petition to the County may request zoning changes for that land.").

The State emphasizes that the EISPN says that there must be an *Environmental Impact Statement* that "cover[s] the entire 3,000 acres." ECF No. 385-1, PageID # 9315 (citing ECF No. 385-2, PageID # 9326). However, because the State differentiated the 1,060-acre parcel from a *zoning* and *developmental* perspective, the Ninth Circuit's decision in *American Savings* indicates that it "*must* be analyzed as a separate parcel." *See* 653 F.2d at 372 (emphasis added); *cf. also Murr*, 137 S. Ct. at 1945 ("[C]ourts should give *substantial*

*weight* to the treatment of the land . . . under state law."
(emphasis added)).

An examination of the additional *Murr* factors confirms
this conclusion. The third *Murr* factor asks whether the
challenged regulation would "add value to the [adjoining]
property." *Murr*, 137 S. Ct. at 1946. The State points to no
evidence in the record that it would. This is not a case in
which maintaining "development restraints" on the 1,060-acre
parcel will protect "unobstructed skyline views" on the
adjoining 2,000 acres. *See id.* at 1946, 1949. Because the
adjoining acreage is largely undeveloped and classified as
agricultural land, *see* ECF No. 385-2, PageID # 9329, its market
value likely either *decreased* or *remained unchanged* given the
reversion order. Undeveloped property is presumably worth more
(in economic terms) when it is next to developed property than
when it is next to undeveloped property. Individuals in a
development may value neighboring undeveloped land as
"recreational space." *See Murr*, 137 S. Ct. at 1946; *cf.* ECF No.
382-11, PageID #s 8059 (discussing Bridge Aina Le'a's plan to
install a "residential community" on the urban acreage and to
install "golf courses" on the "agricultural lots"). The third
factor, like the first factor, weighs in favor of splitting the
denominator--or is at the very least neutral.

The only *Murr* factor that may weigh in favor of the State is the second factor, which looks at the physical characteristics of the landowner's property. As the State points out, the "entire 3,000 acres are contiguous and constitute one area of land." ECF No. 385-1, PageID # 9302. The State also notes that there "is no difference in the geographic or topological characteristics between the urban and agricultural portions." *Id.* Bridge Aina Le'a did not dispute these characterizations of the evidence in the record in its Memorandum in Opposition. *See* ECF No. ECF No. 401, PageID #s 9612-13. But contiguity and topological similarity do not, without more, justify expanding the denominator. *Murr*, *American Savings*, and *Kaiser Development* emphasize differential zoning and planning treatment. This case remains one in which "reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated . . . as separate tracts." *Murr*, 137 S. Ct. at 1945; *see also Lost Tree Vill. Corp.*, 707 F.3d at 1293-95 ("[E]ven when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats the parcel as distinct economic units.").

At points, the State's Renewed Motion attempts to recast *Murr*'s analysis into an inquiry about what "the project

area" is.  *See, e.g.*, ECF No. 385-1, PageID # 9302 (arguing that the correct denominator is the "3,000 acres" because Bridge Aina Le'a "purchased the entire 3,000 acres" and its "plans to develop the area viewed the project area as consisting of 3,000 acres").  But the lodestar of denominator analysis is not what the "project area" is; it is whether a reasonable landowner would anticipate that his holdings would be *treated separately*.  *See Murr*, 137 S. Ct. at 1945.  A reasonable landowner in Bridge Aina Le'a's position certainly would.

The court did not err in instructing the jury that the 1,060-acre parcel was the proper denominator.  The jury's finding of a *Lucas* taking is supported by adequate evidence as a result.[9]

### 4.    Bridge Aina Le'a's Finding of a *Penn Central* Taking Is Supported by Adequate Evidence.

The jury's verdict is independently supported by its finding that a taking occurred under a *Penn Central* analysis.  *See Palazzolo*, 533 U.S. at 632-33 (discussing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978)); ECF No.

_____

[9] The State also argues that the Ninth Circuit's decision in *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (2018), is "instructive" vis-à-vis Bridge Aina Le'a's *Lucas* claim.  *See* ECF No. 392, PageID # 9413.  The court cannot discern how that might be so.  *Colony Cove* concerned a takings claim under *Penn Central* and does not appear to have any bearing on the validity of the jury's *Lucas* verdict.  *See* 888 F.3d at 450-55.

373. The court instructed the jury concerning *Penn Central* as follows:

> To determine whether the Land Use
> Commission's action was a taking under
> Taking Analysis No. 2, you should consider
> three factors:
>
> (1) The economic impact of the regulation
>     on Bridge Aina Le'a,
> (2) The extent to which the regulation has
>     interfered with distinct investment-
>     backed expectations, and
> (3) The character of the governmental
>     action.
>
> You must weigh these three factors to decide
> whether the Land Use Commission's action
> went too far in its impact on Bridge Aina
> Le'a's property. If, after considering
> these factors, you find by a preponderance
> of the evidence that the action went too
> far, you should resolve Taking Analysis No.
> 2 in favor of Bridge Aina Le'a. If, on the
> other hand, you do not find by a
> preponderance of the evidence that the
> action went too far, you should resolve
> Taking Analysis No. 2 in favor of the Land
> Use Commission.
>
> These are factors, not a set formula. No
> factor by itself is necessarily
> determinative or conclusive. Primary among
> these factors are the economic impact of the
> regulation on the claimant and,
> particularly, the extent to which the
> regulation has interfered with distinct
> investment-backed expectations.

ECF No. 372, PageID # 7459. This instruction was given with the agreement of the parties.

Contrary to the State's assertions, *see* ECF No. 385-1, PageID #s 9304-13, the jury reasonably concluded that all three *Penn Central* factors weigh in favor of Bridge Aina Le'a.

### a. Economic Impact.

The first *Penn Central* factor concerns the "economic impact of the regulation on the claimant." *Penn Central*, 438 U.S. at 124. The court instructed the jury:

> you must consider the economic impact of the Land Use Commission's action in reverting the property on Bridge Aina Le'a.
>
> Diminution in property value, standing alone, cannot establish a taking under Taking Analysis No. 2.
>
> The economic impact of the regulation on Bridge Aina Le'a may be measured by the change, if any, in the fair market value to Bridge Aina Le'a's interest in the property caused by the regulatory imposition.
>
> Bridge Aina Le'a must show that the Land Use Commission's action caused the economic impact, not Bridge Aina Le'a itself, a third party, or independent circumstances.

ECF No. 372, PageID # 7461. This instruction was given with the agreement of the parties.

The State claims that the evidence failed to show a "legally sufficient economic impact." ECF No. 385-1, PageID # 9306. According to the State, "there is no evidence that the [Land Use Commission's] action affected Bridge in any way." *Id.* The State is mistaken on multiple levels.

55

First, the State appears to rely, at least in part, on its prior assertion that Bridge Aina Leʻa "sold the property" and retained only a token interest in the land. ECF No. 385-1, PageID # 9293. As the court has already explained, the jury could have reasonably concluded that Bridge Aina Leʻa's property interests in the land were substantial and that its interests were adversely affected by the reversion. Even if Bridge Aina Leʻa had sold its right to develop the property, the reversion order could have adversely affected the value of other rights Bridge Aina Leʻa retained.

Second, as the State concedes, testimony at trial indicated that the 1,060-acre property was "worth $40 million" if "in the urban district" and "$6.63 million" if "in the agricultural district." *See* ECF No. 392, PageID # 9412; ECF No. 401, PageID # 9617. That represents an 83.5% diminution in value, and, as noted, there is no reason to think that this diminution only concerned alienated property interests. After hearing this evidence, the jury could have reasonably determined that the economic impact of the regulation weighed in favor of a taking under *Penn Central*.[10]

---

[10] Because the evidence concerning the diminution of the property value suffices to support the jury's verdict, the court need not address the legal import of additional evidence presented concerning contractual, property tax, and insurance payments. *See* ECF No. 392, PageID #s 9412-13; ECF No. 401, PageID #s 9617-18. Such evidence may not be relevant in

The Ninth Circuit's recent decision in *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (2018), is not to the contrary.  According to the State, *Colony Cove* held that an "83.5% diminution in value" can never "be a taking."  ECF No. 392, PageID # 9412.  *Colony Cove* did not so hold.

In discussing the economic impact prong of *Penn Central*, *Colony Cove* noted that a diminution in value "ranging from 75% to 92.5% does not constitute a taking" without evidence concerning the additional *Penn Central* factors.  888 F.3d at 451.  *Colony Cove* further observed that "[t]he Federal Circuit has noted that it is 'aware of no case in which a court has found a taking where diminution in value was less than 50%.'" *Id.* (quoting *CCA Assocs. V. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)).  Thus, *Colony Cove* indicates only that a diminution in property value of less than 50% will weigh heavily against a taking, and that a diminution in value ranging between 75% and 92.5% will not necessarily establish a taking.  *See id.*;

---

divining the economic impact of a regulation.  *See Colony Cove Props.*, 888 F.3d at 451 (stating only that "economic impact is determined by comparing the total value of the affected property").  The State asserts in a footnote that DW Aina Leʻaʼs "[in]ability to perform [] contracts with Bridge" is not relevant to takings analysis.  ECF No. 385-1, PageID # 9306 n.1.  The State does not cite law indicating that a contractual default is neither an "economic impact" nor evidence of disruption to "investment-backed expectations."  Nor did the State ask that the court's jury instructions concerning *Penn Central*'s first and second prongs tell the jury not to consider such evidence.  *See* ECF No. 372, PageID #s 7460-61.

*see also, e.g.*, *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189 (9th Cir. 2012) (explaining that "Supreme Court cases uniformly reject the proposition that diminution in property value, standing alone, can establish a taking," and further explaining that "[a]lthough there is no precise minimum threshold, [evidence of an economic loss of less than 15%] is of very little persuasive value in the context of a federal takings challenge" (internal quotation marks and citations omitted)). The case does not suggest that an 83.5% diminution in value automatically makes the first factor weigh against a takings claimant.

The State's remaining arguments are equally unpersuasive. The State points to a rebound in the value of the land after the reversion order, and to the profit BAL eventually turned relative to its initial investment. *See* ECF No. 385-1, PageID #s 9308-09. These circumstances do not negate Bridge Aina Le'a's temporary takings claim. While relevant to a just compensation calculation, they do not speak to the question of takings liability during the period in which the reversion order was in effect. *See, e.g.*, *First English*, 482 U.S. at 310; *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 183 n.6 (1985); *Herrington v. Cty. of Sonoma*, 834 F.2d 1488, 1504-06 (9th Cir. 1987); *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987); *cf.*

*Tahoe-Sierra,* 535 U.S. at 328 ("[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." (emphasis omitted) (quoting *First English*, 482 U.S. at 321)).

Nor does it matter whether development on the property was or was not proceeding apace. *Cf. Tahoe-Sierra*, 216 F.3d at 783 n.33 ("[I]n most regulatory takings cases, there is no doubt whatsoever about whether the government's action was the cause of the alleged taking."). The State is mistaken in asserting that the reversion could not have had an adverse economic impact on the property because development could not "proceed for a variety of [independent] reasons." *See* ECF No. 385-1, PageID # 9309. Property can retain value as a potential site for future development, regardless of whether antecedent obligations--like the need to "obtain final subdivision approval" and to prepare an EIS--must be satisfied. *See id.* And a facially permanent zoning reclassification can undoubtedly harm such future development value by forbidding any such development outright.

The State's argument may indeed relate to whether the reversion order harmed Bridge Aina Le'a in a specific manner, i.e., by causing a delay in the opening of the proposed

residential community. *Cf.* ECF No. 385-1, PageID # 9310
(arguing that "Bridge's claim to economic impact depends . . .
on the magical thinking that if only the reversion had not
occurred somehow the development would have succeeded"). But
that was not the adverse economic impact before the jury. *See*
*Colony Cove Props.*, 888 F.3d at 451 ("[E]conomic impact is
determined by comparing the total value of the affected property
before and after the government action."). The evidence at
trial focused on the effect of the reversion on the value of the
property, not on whether the reversion forestalled the receipt
of revenue from future housing sales. The evidence established
that the reversion caused the decrease in *value*.

Finally, the State's reply adds that "the economic-
impact factor, if not satisfied, is case dispositive." ECF No.
403, PageID #9663. As discussed above, the jury could have
reasonably found that the economic impact factor *was* satisfied,
but the court further notes that the State's characterization of
the *Penn Central* factors is incorrect. As stated in the court's
*Penn Central* jury instructions, "[n]o factor by itself is
necessarily determinative or conclusive." ECF No. 372, PageID
# 7459. Further, the cases cited by the State make clear that
*Penn Central* did not establish a "set formula" such that any one
factor is dispositive. *See, e.g.*, *Guggenheim v. City of Goleta*,
638 F.3d 1111, 1121 (9th Cir. 2010).

### b. Distinct Investment-Backed Expectations.

The second *Penn Central* factor goes to "the extent to which the regulation has interfered with distinct investment-backed expectations." *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013). The court instructed the jury:

> The primary factor is the extent to which the regulation has interfered with Bridge Aina Le'a's reasonable distinct investment-backed expectations.
>
> In deciding whether (and to what extent) this factor weighs in favor of Bridge Aina Le'a or the Land Use Commission, you should ask: (1) Did Bridge Aina Le'a have an expectation that the government's action interfered with? (2) If so, was that expectation settled? (3) Was that expectation reasonable? (4) Was that expectation investment-backed?
>
> Distinct investment-backed expectations are measured at the time the claimant acquires the property.
>
> "Distinct investment-backed expectations" implies reasonable probability. Whether a particular expectation is reasonable is judged from the point of view of a reasonable investor in Bridge Aina Le'a's position at the time of its investment.
>
> A distinct investment-backed expectation must be probable enough to materially affect the price or value of the property.

ECF No. 372, PageID # 7461. This instruction was given with the agreement of the parties.

The State asserts that this factor does not support a verdict in Bridge Aina Le'a's favor. *See* ECF No. 385-1, PageID # 9305. The State relies on the Ninth Circuit's 2010 *Guggenheim* decision, which held:

> "Distinct investment-backed expectations"
> implies reasonable probability, like
> expecting rent to be paid, not starry eyed
> hope of winning the jackpot if the law
> changes. . . . Speculative possibilities of
> windfalls do not amount to "distinct
> investment-backed expectations," unless they
> are shown to be probable enough materially
> to affect the price.

638 F.3d at 1120.

In *Guggenheim*, the Ninth Circuit determined that the plaintiffs' expectations were not "reasonably probable" because they "bought a trailer park burdened by rent control, and had no concrete reason to believe that they would get something much more valuable, because of hoped-for legal changes, than what they had." *Id.* at 1120-21; *see also, e.g.*, *Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 987 (9th Cir. 2002) ("Esplanade . . . took the risk, when it purchased this large tract of tidelands in 1991 for only $40,000, that, despite extensive federal, state, and local regulations restricting shoreline development, it could nonetheless overcome those numerous hurdles to complete its project and realize a substantial return on its limited initial investment." (internal quotation markets omitted)).

There is ample evidence concerning Bridge Aina Le'a's investment-backed expectations for the property. *See* ECF No. 401, PageID #s 9620-21. But according to the State, Bridge Aina Le'a's investment-backed expectations were not reasonable, as they were allegedly grounded on a "starry eyed hope" of a change in the law. *See* ECF No. 385-1, PageID #s 9305-06. The State points to Bridge Aina Le'a's purchase of property "with an affordable-housing condition attached that [Bridge Aina Le'a] admitted would render the development of the property economically unviable." *Id.* The State then argues that at the time of the acquisition the likelihood that this condition would be amended was not a "reasonable probability" but rather a "mere 'starry eyed hope.'" *Id.* at PageID #s 9605-06 (quoting *Guggenheim*, 638 F.3d at 1120).

The State has failed to carry its burden of showing that the evidence requires a conclusion contrary to the jury's verdict. *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *Enovsys LLC v. AT&T Mobility LLC*, No. CV 11-5210 SS, 2015 WL 11089498, at *4 n.5 (C.D. Cal. Nov. 16, 2015). The record itself, moreover, belies any contention that Bridge Aina Le'a lacked a "reasonable probability" that the law would be amended. There was evidence that similar amendments had been obtained by other developers in six other instances. *See* ECF No. 382-12, PageID #s 8125-26; ECF No. 401, PageID # 9619 (referencing

63

testimony by Baldwin and Paoa).  Bridge Aina Leʻa paid
$5,000,000 for the land despite the affordable-housing
condition, a sum that suggests an expectation that the
"economically unviable" land-use condition would be amended.
*See* ECF No. 382, PageID # 8464; *Guggenheim*, 638 F.3d at 1120
(explaining that conditions are reasonably probable when they
are "probable enough materially to affect the price"); *cf.*
*Esplanade Props.*, 307 F.3d at 987 (reasoning that an
insubstantial "$40,000" purchase price indicated that the
plaintiff lacked a reasonable investment-backed expectation).

A reasonable jury could have concluded that the second
*Penn Central* factor weighed in favor of Bridge Aina Leʻa.

Bridge Aina Leʻa presented evidence that it
anticipated receiving a 20% return on its initial investment,
which is similarly inconsistent with the presence of an
"economically unviable" land-use condition unlikely to be
amended.  *See* ECF No. 401, PageID # 9619 (describing testimony
from Baldwin).  And, of course, the condition was, in fact,
amended.  *See* ECF No. 401, PageID # 9619.

A reasonable jury could have concluded that the second
*Penn Central* factor weighed in favor of Bridge Aina Leʻa.

### c. The Character of the Governmental Action.

The jury's *Penn Central* verdict can likely be
sustained solely based on the state of the record as it concerns
the first two *Penn Central* factors.  *See Laurel Park Cmty.*, 698

64

F.3d at 1191 (in a parenthetical, stating that "the first two factors are the 'primary' factors to consider; the character of the governmental action is not on equal footing" (citing *Guggenheim*, 638 F.3d at 1120)); *see also Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 540 (2005) ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.").  But the jury could have reasonably concluded that the third factor also weighed in favor of Bridge Aina Le'a.

The court instructed the jury concerning this factor as follows:

> Remember that Taking Analysis No. 2 turns in large part but not exclusively on the first two factors that I just described to you. The third factor, the character of the governmental action, may also be relevant in discerning whether a taking has occurred.
>
> In determining the character of the government action, you may look to a number of factors, including whether the Land Use Commission acted improperly in that its regulation was calculated to discriminate against Bridge Aina Lea or singled out Bridge Aina Lea for differential treatment in an arbitrary manner.  You may also decide whether the action is akin to a physical invasion of land, or if it instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good.

In deciding whether this third factor weighs
overall in favor of Bridge Aina Lea or the
Land Use Commission, you may rely on as many
or as few of the above considerations as you
find applicable.

ECF No. 372, PageID # 7462.  This instruction was
given with the agreement of the parties.

The jury could have reasonably concluded that the
character of the government action weighed in favor of a taking.
The reversion order was an adjudicative decision that directly
affected the owners of the property.  Credible testimony
indicated that the Land Use Commission intended the reversion to
"force Bridge to sell the Property to another owner/developer."
*See* ECF No. 401, PageID #s 9622-23 (discussing Meyer's
testimony).  Additional evidence indicated that the Land Use
Commission had not taken adverse action against other developers
whose projects suffered from even longer delays, which a
reasonable jury could view as establishing that Bridge Aina Le'a
had been treated unfairly and differently from other similarly
situated developers.  *See id.* at PageID # 9624 (discussing
Devens's testimony concerning other developers, and further
noting that there is "no dispute that the LUC's decision to
revert the Property's classification was the first time in its
50 year history that it had taken such action"); ECF No. 382-7,
PageID #s 7928-31.  Finally, under Hawaii law, the reversion of
the property was unlawful.  *See DW Aina Le'a, LLC v. Bridge Aina*

*Le'a, LLC*, 134 Haw. 187, 213-16 (2014) (holding that the Land Use Commission acted illegally by failing to follow applicable procedures in Haw. Rev. Stat. § 205-4).

There was, in short, ample evidence supporting a finding that the reversion was not akin to "some public program adjusting the benefits and burdens of economic life to promote the common good." *See Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124); *see also, e.g.*, *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) ("In this case, the Town's actions are not part of a public program adjusting the benefits and burdens of public life. Rather, the Town singled out Sherman's development, suffocating him with red tape to make sure he could never succeed in developing MareBrook."); *Heitman v. City of Spokane Valley*, No. CV-09-0070-FVS, 2010 WL 816727, at *5 (E.D. Wash. Mar. 5, 2010) (indicating that proper character considerations include whether the government "acted improperly" and whether the landowner had been unfairly "singled out for differential treatment"), *aff'd sub nom. Conklin Dev. v. City of Spokane Valley*, 448 F. App'x 687 (9th Cir. 2011); Thomas Merrill, *Character of Government Action*, 36 Vt. L. Rev. 649, 664-67 (2012) (explaining that many courts understand the distributional impact of governmental action--i.e., whether its burdens are concentrated or diffuse--as speaking to the "character" of the action).

The State's arguments to the contrary are
unpersuasive.  The State takes issue with Bridge Aina Leʻa's
failure to offer additional evidence concerning the "other [Land
Use Commission] dockets" involving the other developers.  *See*
ECF No. 385-1, PageID # 9312 (describing the Hawaii Supreme
Court's holding that Bridge Aina Leʻa failed to "demonstrate[]
that they were treated differently than other similarly situated
developers because the documents from the LUC cases involving
the other developers were not properly included in the record on
appeal" (quoting *DW Aina Leʻa*, 134 Haw. at 220)).  But the
evidence that Bridge Aina Leʻa *did* offer already suffices to
support the jury's verdict.  The absence of *additional* proof
related to certain Land Use Commission dockets does not
undermine the evidence presented.

The State also asserts that the character prong weighs
against a taking because the Hawaii Supreme Court denied Bridge
Aina Leʻa's equal protection claim.  *See id.* (discussing *DW Aina
Leʻa*, 134 Haw. 187).  The State asserts that this negates Bridge
Aina Leʻa's proof "that it was treated differently or unfairly."
*Id*.  The State's reliance on the Hawaii Supreme Court's opinion
is unpersuasive on multiple levels.

First, the Hawaii Supreme Court's opinion concerned a
different standard, under which Bridge Aina Leʻa was required to
prove that it had "been intentionally treated differently from

68

others similarly situated and that there [wa]s no rational basis for the difference in treatment." *DW Aina Le'a*, 134 Haw. at 220 (quoting *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The Hawaii Supreme Court was unable to say that the Land Use Commission's actions were "irrational." *Id.*

While there is little case law speaking directly to this issue, it does not make sense to require a takings plaintiff to establish a violation of the Equal Protection Clause to prove that the character of the governmental action weighs in favor of a taking. It is not clear why a plaintiff would always be barred from showing unfair and unequal treatment on the ground that such differential treatment is not so out of bounds as to be considered irrational. *Cf. McClung v. City of Sumner*, 548 F.3d 1219, 1227 (9th Cir. 2008) (finding that the character prong favored the government in part because the facts of the case did not involve "an adjudicative determination applicable solely to the McClungs"), *abrogated on other grounds*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 861 (9th Cir. 2001) (explaining that the character prong favored the government in part because "neither Brown nor Hayes is being singled out to bear a burden that should be borne by the public as a whole"), *aff'd on other grounds sub nom. Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).

Second, the evidence before the jury differs from the evidence that was before the Hawaii Supreme Court. The Hawaii Supreme Court's decision was based in part on a lack of evidence speaking to whether Bridge Aina Leʻa was "treated differently," after Bridge Aina Leʻa had tried unsuccessfully to introduce "documents from the LUC cases involving the other developers." *DW Aina Leʻa*, 134 Haw. at 217, 220. At trial, Bridge Aina Leʻa did not offer "exhibits as to other dockets." ECF No. 385-1, PageID # 9312. Its proof concerning the alleged differential treatment took the form of different documents and live testimony. *See* ECF No. 401, PageID # 9624. Ultimately, the Hawaii Supreme Court's opinion did not preclude the jury from reaching its own conclusion regarding the distinguishable issue of the character of the governmental action. The jury in *this* case had evidence supporting a finding of unfair and differential treatment.

Finally, the Hawaii Supreme Court's opinion does not address a variety of additional considerations under the character prong--including, as noted, whether the Land Use Commission suffocated Bridge Aina Leʻa in "red tape," "acted improperly," or made "an adjudicative determination" involving concentrated rather than diffuse costs. *See Sherman*, 752 F.3d at 565; *McClung*, 548 F.3d at 1227; *Heitman*, 2010 WL 816727, at *5.

Shifting tactics, the State argues that the character prong must cut in its favor because the governmental action involved the enforcement of a "long-standing condition" that was "requested" by Bridge Aina Le'a.  *See* ECF No. 385-1, PageID # 9310 (citing *Guggenheim*, 638 F.3d at 1120).  The State overreads *Guggenheim*.  That case does not support the proposition that when a State *unlawfully* attempts to enforce an "old" and "requested" land-use condition, the character of its action will invariably weigh against a taking.  *See Guggenheim*, 638 F.3d at 1120.

The State similarly fails to cite any case supporting its position that the character prong weighs in its favor when there is "no physical invasion, occupation, or restraint placed on the property, and [the] plaintiff [i]s permitted to use the property in many different ways."  ECF No. 385-1, PageID # 9311.  Whether there has been an actual physical invasion of property is not the test; if it were, the character inquiry would be superfluous.  *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015) (discussing a takings analysis under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), pursuant to which "a physical appropriation of property . . . g[ives] rise to a *per se* taking" (emphasis omitted)).  Similarly, whether some uses of property are "permitted" may be relevant to a *Lucas* analysis, but that inquiry does not address whether

71

government action is akin to "a public program adjusting the benefits and burdens of economic life to promote the common good." *See Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124).

The jury could have reasonably concluded that all three *Penn Central* factors weighed in favor of a taking.

**B.    The State Is Not Entitled to a New Trial.**

The State claims that it is entitled to a new trial on three grounds.  None has merit.

First, the State argues that the court erroneously removed the denominator question from the jury.  *See* ECF No. 385-1, PageID #s 9314-16.  For the reasons already discussed, the court did not err in resolving that issue itself.

Second, the State insists that the court erroneously instructed the jury that Bridge Aina Le'a's takings claim is based upon "the U.S. Constitution" and also asserts that opposing counsel "abused this instruction at closing argument." *Id.; see also* ECF No. 339, PageID # 7099 (arguing that the "jury does not need to know that the law emerges from the [C]onstitution, a statute, or the common law, only what the law is").  This argument is unpersuasive.  There is no bar on referring to the Constitution in United States courtrooms.  In any event, the State fails to discuss, let alone demonstrate, how the court's reference to the Constitution or opposing

counsel's discussion of it caused any prejudice.  A new trial requires more than a bald assertion of error.  *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

Finally, the State claims that the verdict is "against the great weight of the evidence" for "all of the reasons stated" earlier in its motion.  ECF No. 385-1, PageID # 9314.  This court has earlier in this Order addressed those reasons.  *Cf. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-CV-05235-MMC, 2016 WL 4446991, at *11 (N.D. Cal. Aug. 24, 2016) (denying a motion for new trial when "Fairchild makes no attempt, apart from essentially incorporating by reference the arguments addressed above, to show the verdict is 'contrary to the clear weight of the evidence,' based on 'evidence which is false,' or a 'miscarriage of justice'" (quoting *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976))).

The State does raise one additional specific argument in support of its view that the verdict is against "the great weight of the evidence," but the argument is unsupported.  The State claims that Bridge Aina Le'a's "expert Stephen Chee was not reliable because he was not using an actual plan, was not aware of the data, and was using numbers based upon a fictitious development in the subdivision method, which is notoriously sensitive to small changes."  ECF No. 385-1, PageID # 9314.  The

State does not explain its reasoning further, cite to anything in the record, or discuss how a rejection of Chee's testimony might have affected the adequacy of the jury's verdict. *See id.*

The court is not convinced that Chee's opinion was so lacking in reliability that a new trial is warranted. Quite simply, the State has "not demonstrated its entitlement to a new trial." *S. Tahoe Pub. Util. Dist. v. 1442.92 Acres or Land in Alpine Cty.*, No. 2:02-CV-0238-MCE-JFM, 2006 WL 2308288, at *2 (E.D. Cal. Aug. 9, 2006); *see also Gonzales v. Arrow Fin. Servs. LLC*, No. 05CV0171 JAH(RBB), 2010 WL 11508991, at *5 (S.D. Cal. Feb. 18, 2010).

## V.     CONCLUSION.

The Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 27, 2018.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n et al., Civ. No. 11-00414 SOM-KJM; ORDER DENYING STATE OF HAWAII'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.